IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TRICIA K. GOODE,

               Plaintiff,

        v.                            Civil Action No. 1:06-CV-113

MICHAEL ASTRUE,
Commissioner of Social Security,

               Defendant.


## CORRECTED REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

     Plaintiff, Tricia K. Goode, (Claimant), filed her Complaint on July 24, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse

decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed

his Answer on October 30, 2006.[2]  Claimant filed her Motion for Summary Judgment on

February 12, 2007.[3]  Commissioner filed her Motion for Summary Judgment on March 13,

2007.[4]  Claimant filed a Reply on March 23, 2007.[5]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 14.

[4] Docket No. 16.

[5] Docket No. 17

1. <u>Claimant's Motion for Summary Judgment</u>.

2. <u>Commissioner's Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so he may give further consideration to the question of whether Claimant can perform any positions consistent with her residual functional capacity.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II. Facts

A.    <u>Procedural History</u>

Claimant filed an application for Social Security Disability Insurance Benefits on August 15, 2001, alleging disability since July 24, 1999. The application was denied and initially and on reconsideration. Claimant requested review by an ALJ and received a hearing on July 24, 2002. The ALJ issued a decision adverse to Claimant on October 23, 2002. Claimant requested review by the Appeals Council. Before the Appeals Council ruled on the appeal, Claimant filed a second application for Disability Insurance Benefits and a first application for Supplemental Security Income. Both claims were denied initially and on reconsideration. On February 19, 2003, the Appeals Council remanded the case to the ALJ. The Appeals Council found evidence had been obtained after the administrative hearing that Claimant was not given an opportunity to explain. It ordered the ALJ to hold a new hearing where Claimant could explain her position regarding the evidence and to issue a new opinion. The Appeals Council also ordered the second

application for Disability Insurance Benefits consolidated with the first application and gave the ALJ the choice of whether the consolidate the Supplemental Security Income application. A new hearing was held on June 11, 2003. On August 12, 2003, the ALJ issued a decision finding Claimant was not entitled to Disability Insurance Benefits or Supplemental Security Income. Claimant again requested review by the Appeals Council and submitted additional evidence in support of her claim, but the Appeals Council denied the request for review. Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 30 years old on the date of the June 11, 2003 hearing before the ALJ. Claimant has a high school education and an associate degree in computer science. Claimant has prior work experience as a telemarketer, department store customer service clerk, grocery store cashier, data entry clerk, and owner and operator of a child care center.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: July 24, 1999 – August 12, 2003.[6]

**Physical Residual Functional Capacity Assessment, 9/18/01, Tr. 126**
Exertional limitations: none established
Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

---

[6] Some of the evidence in the record comes from before Claimant's alleged onset date of disability. Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).

**Michael Wayt, M.D., 12/29/99, Tr. 201**
Ord. diagnosis: abdominal pain

Impression: mild ileus

**Romeo B. Tan, M.D., 10/19/00, Tr. 203**
Discharge diagnoses: acute appendicitis, diabetes mellitus

**Romeo B. Tan, M.D., 10/19/00, Tr. 204**
Diagnosis: acute appendicitis NOS, diabetes mellitus without comp, type II, not S

**Romeo B. Tan, M.D., 10/17/00, Tr. 206**
Impression: acute appendicitis

**Romeo B. Tan, M.D., 10/17/00, Tr. 208**
Diagnosis: acute suppurative appendicitis, moderate

**Leigh Anne Papadimitriou, M.D., 9/18/01, Tr. 218**
Pre-operative diagnosis: dyspareunia

Post-operative diagnosis: same with left ovary adhesed to the vaginal cuff

**Leigh Anne Papadimitriou, M.D., 9/12/01, Tr. 221**
Impression: pelvic pain

**Psychiatric Review Technique, 9/8/01, Tr. 226**
Medical disposition: impairment not severe

The patient suffers from depression and takes Zoloft

Functional limitation and degree of limitation
     Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: mild
     Repeated episodes of decompensation, each of extended duration: none

**Michael Wayt, M.D., 10/3/01, Tr. 242**
Assessment: IDDM, uncontrolled, depression

**Michael Wayt, M.D., 9/14/01, Tr. 243**
Assessment: IDDM, uncontrolled, depression, most likely caused by the first impairment.

**Michael Wayt, M.D., 7/27/01, Tr. 244**
Assessment: NIDDM, poorly controlled, hypoglycemic episode

**Michael Wayt, M.D., 7/9/01, Tr. 245**
Assessment: contact dermatitis, most likely due to poison ivy

**Michael Wayt, M.D., 5/1/01, Tr. 246**
Assessment: IDDM, poorly controlled, history of abnormal thyroid studies

**Michael Wayt, M.D., 11/27/00, Tr. 248**
Assessment: IDDM

**Michael Wayt, M.D., 10/30/00, Tr. 249**
Assessment: right lower quadrant pain status post appendectomy secondary to appendicitis, IDDM, depression

**Michael Wayt, M.D., 9/18/01, Tr. 250**
Assessment: IDDM, depression

**Michael Wayt, M.D., 8/23/01, Tr. 251**
Assessment: acute stress reaction, anxiety

**Michael Wayt, M.D., 7/12/01, Tr. 252**
Assessment: left shoulder pain, suspect musculoskeletal, right lower extremity pain, questionable radicular pain, minimal low back pain, IDDM

**Michael Wayt, M.D., 4/26/00, Tr. 253**
Assessment: left shoulder pain, low back pain, thought to be more musculoskeletal

**Michael Wayt, M.D., 12/29/99, Tr. 254**
Assessment: abdominal pain, etiology unclear, IDDM

**Michael Wayt, M.D., 10/27/99, Tr. 255**
Assessment: low back pain, improved, IDDM, improved, abnormal TSH value

**Michael Wayt, M.D., 10/8/99, Tr. 256**
Assessment: low back pain with no apparent cause

**Michael Wayt, M.D., 8/30/99, Tr. 257**
Assessment: IDDM

**Michael Wayt, M.D., 8/16/99, Tr. 259**
Impression: IDDM, poorly controlled, tobacco abuse

**Michael Wayt, M.D., 1/29/00, Tr. 273**
Impression: the patient had a prior hysterectomy. The remaining two ovaries are within normal limits.

**Michael Wayt, M.D., 12/29/99, Tr. 275**
Impression: mild ileus

**Lisa Michalski, PA-C and John Michalski, PA-C, 12/27/01, Tr. 287**
Assessment: left hamstring strain

**Physical Residual Functional Capacity Assessment, 2/26/02, Tr. 292**
Exertional limitations
       Occasionally lift and/or carry 50 pounds
       Frequently lift and/or carry 25 pounds
       Stand and/or walk about 6 hours in an 8 hour work day
       Sit for a total of about 6 hours in an 8 hour work day
       Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Psychiatric Review Technique, 2/28/02, Tr. 301**
Medical disposition: impairment not severe

The patient has depressive syndrome characterized by: sleep disturbance, decreased energy, difficulty concentrating or thinking

The patient has a medically determinable that does not precisely satisfy the standard diagnostic criteria: major depression and (illegible).

Functional limitation and degree of limitation
       Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: mild
       Episodes of decompensation, each of extended duration: none

**Viorica Maria Crisan, M.D., 12/17/01, Tr. 316**
Assessment: type I diabetes of three years duration with elevated blood sugars throughout the day but nocturnal hypoglycemia

**Trent G. Mason, M.D., 4/19/02, Tr. 322**
Assessment: type I diabetes with some chest angina

**Trent G. Mason, M.D., 5/24/02, Tr. 322**
Assessment: insulin dependent diabetes, left leg paresthesias, undetermined diagnosis

**Trent G. Mason, M.D., 2/22/02, Tr. 323**
Assessment: type I diabetes, depression

**Trent G. Mason, M.D., 2/11/02, Tr. 324**
Assessment: type I diabetes, neuropathic left leg pain with chronic back pain, depression with some sleep disturbance

**Trent G. Mason, M.D., 1/21/02, Tr. 325**
Assessment: insulin dependent diabetes, chronic left leg pain, depression

**Trent G. Mason, M.D., 11/19/01, Tr. 326**
Assessment: continued left leg and hip pain, insulin dependent diabetes mellitus, depression

**Trent G. Mason, M.D., 11/7/01, Tr. 327**
Assessment: insulin dependent diabetes mellitus with high morning readings, trochanteric bursitis, depression

**Trent G. Mason, M.D., 10/22/01, Tr. 328**
Assessment: insulin dependent diabetes

**Trent G. Mason, M.D., 2/16/02, Tr. 334**
Ord. diagnosis: chronic back pain/left leg pain

Impression: L5-S1 disc degeneration, but without disc protrusion or spinal stenosis

**Trent G. Mason, M.D., 11/14/01, Tr. 336**
Ord. diagnosis: enthesopathy of hip

Impression: normal left hip, small area of sclerosis along the iliac side of the left SI joint.

**Barbara L. Rush, Ph.D., 10/24/01, Tr. 352**
Diagnostic impression: major depression

**Stephen Nutter, M.D., 8/28/02, Tr. 363**
Impression: left leg pain, fatigue, diabetes, insulin-dependent

**Medical Assessment of Ability to Do Work-Related Activities (Physical), 9/6/02, Tr. 371**
Are lifting/carrying affected by the impairment? Yes
    If yes, how many pounds can the individual lift and/or carry?  50 pounds
    Maximum occasionally?  30 pounds
    Maximum frequently?  25 pounds

Are standing/walking affected by the impairment?  Yes
    If yes, how many hours in an 8 hour work day can the individual stand and/or walk?  6-7

Without interruption?  2-3

Is sitting affected by the impairment?  Yes
    If yes, how many hours in an 8 hour work day can the individual sit?  6-7
    Without interruption?  2-3

How often can the individual perform the following postural activities?
    Balance, crouch, kneel, crawl: frequently
    Climb, stoop: occasionally

Are the following physical functions affected by the impairment?
    Reaching, handling, feeling, hearing, speaking: no
    Pushing/pulling, seeing: yes

Are there environmental restrictions caused by the impairment?
    Heights, temperature extremes, chemicals, dust, noise, fumes, humidity, other: no
    Moving machinery, vibration: yes

**Frank Eibl, Jr., M.A. and Paul Young, Ph.D., 9/8/02, Tr. 376**
WAIS III
    Verbal IQ: 92
    Performance IQ: 86
    Full scale IQ: 89

The WAIS III scores appear valid.

WRAT-III
    Reading: 98, high school range
    Spelling: 101, high school range
    Arithmetic: 6th grade

The WRAT-III scores are considered valid.

Diagnostic impression:
Axis I: major depression, recurrent, without psychotic features
Axis II: no diagnosis:
Axis III: diabetes

Prognosis: generally fair

**Medical Assessment of Ability to Do Work-Related Activities (Mental), 9/19/02, Tr. 383**
Is the ability to understand, remember and carry out instructions affected by the impairment?  No
indication
    Understand and remember short, simple instructions, carry out short, simple instructions,

the ability to make judgments on simple work-related decision: no impairment

      Understand and remember detailed instructions, carry out detailed instructions: slight impairment

Is the ability to respond appropriately to supervision, co-workers, and work pressure in a work setting affected by the impairment? No indication

      Interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, respond appropriately to changes in a routine work setting: moderate

Can the individual manage benefits in her own interest? Yes

**(Unsigned), 4/17/99, Tr. 518**
Impression: diabetes mellitus type I

**(Unsigned), 4/14/99, Tr. 519**
Impression: diabetes mellitus type I

**(Unsigned), 4/10/99, Tr. 520**
Impression: diabetes mellitus type I with still out of control blood sugars, anorexia

**(Unsigned), 3/31/99, Tr. 521**
Impression: polyuria

**(Unsigned), 8/3/98, Tr. 522**
Impression: ceruminosis with irrigation of the left ear.

**Leigh Anne Papadimitriou, M.D., 1/23/02, Tr. 535**
Pre-operative diagnosis: pelvic pain

Post-operative diagnosis: same

Final diagnosis: ovarian cortical cysts, small

**(Signature illegible), (Undated), Tr. 541**
Referring diagnosis: muscle weakness, diabetes

Problems: 10/10 max pain (illegible), (illegible), functional mobility

**Trent G. Mason, M.D., 11/14/01, Tr. 542**
Impression: small area of sclerosis along the iliac side of the left SI joint

**Richard Capito, M.D., 7/24/02, Tr. 543**
Diagnosis at discharge: contusion to left leg, contusion to left knee, type I diabetes mellitus

**Trent G. Mason, M.D., 7/26/02, Tr. 545**
Assessment: insulin dependent diabetes

**Trent G. Mason, M.D., 6/25/02, Tr. 547**
Assessment: insulin dependent diabetes per endocrinology

**Trent G. Mason, M.D., 7/8/02, Tr. 547**
Assessment: type I diabetes, pharyngitis

**Trent G. Mason, M.D., 12/23/02, Tr. 568**
Assessment: severe pain, possibly diabetic neuropathy in general

**Trent G. Mason, M.D., 10/28/02, Tr. 569**
Assessment: bilateral knee pain with hip pain, early diabetic neuropathy

**Trent G. Mason, M.D., 7/26/02, Tr. 570**
Assessment: insulin dependent diabetes, mild neuropathic pain

**Trent G. Mason, M.D., 6/25/02, Tr. 571**
Assessment: insulin dependent diabetes per endocrinology, left leg pain

**Trent G. Mason, M.D., 7/8/02, Tr. 571**
Assessment: type I diabetes, pharyngitis

**Trent G. Mason, M.D., 11/14/01, Tr. 579**
Ord. diagnosis: ethesopathy of hip

Impression: normal left hip, small area of sclerosis along the iliac side of the left SI joint

**Physical Residual Functional Capacity Assessment, 2/7/03, Tr. 581**
Exertional limitations
>            Occasionally lift and/or carry 20 pounds
>            Frequently lift and/or carry 10 pounds
>            Stand and/or walk for a total of about 6 hours in an 8 hour work day
>            Sit for a total of about 6 hours in an 8 hour work day
>            Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Psychiatric Review Technique, 2/7/03, Tr. 589**

Medical disposition: impairment not severe

The patient has major depressive disorder

Functional limitation and degree of limitation
    Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: mild
    Episodes of decompensation, each of extended duration: none

**J. Sandlin, M.D., 5/23/03, Tr. 607**
Impression: bilateral articular patella compression syndrome

**J. Sandlin, M.D., 4/11/03, Tr. 608**
Impression: lateral articular compression facet syndrome

**J. Sandlin, M.D., 3/26/03, Tr. 609**
Impression: bilateral lateral facet syndrome patella

**J. Sandlin, M.D., 2/12/03, Tr. 610**
Impression: lateral patellar facet syndrome

**Jesse Sandlin, M.D., 4/3/03, Tr. 613**
Pre-operative diagnosis: lateral patella articular facet compression syndrome

Post-operative diagnosisL same

**Trent G. Mason, M.D., 5/29/03, Tr. 619**
Assessment: acute migraine headaches

**Trent G. Mason, M.D., 2/6/03, Tr. 620**
Assessment: type I diabetic, bilateral knee pain with normal weight bearing x-rays

**J. Sandlin, M.D., 6/30/03, Tr. 623**
Impression: bilateral painful patellar syndrome

**Jorge W. Roig, M.D., 10/23/03, Tr. 665**
Impression: bilateral lower extremity pain secondary to diabetic neuropathy, chronic right knee pain

**Patrick J. Demeo, M.D., 2/18/04, Tr. 682**
Pre-operative diagnosis: right knee patellofemoral malalignment

Post-operative diagnosis: right knee patellofemoral malalignment

**Trent G. Mason, M.D., 4/3/03, Tr. 690**
Final diagnosis: patellofemoral syndrome and arthro-(illegible)

**Jesse Sandlin, M.D., 4/3/03, Tr. 691**
Pre-operative diagnosis: lateral patella articular facet compression syndrome

Post-operative diagnosis: same

**(Signature illegible), 1/7/03, Tr. 708**
Assessment: knee pain, diabetic neuropathy

**Trent G. Mason, M.D., 12/23/02, Tr. 709**
Assessment: severe pain, possibly diabetic neuropathy in general.  It is mostly in her knees

**Trent G. Mason, M.D., 2/6/03, Tr. 710**
Assessment: type I diabetic, bilateral knee pain with normal weight bearing x-rays

D.    <u>Testimonial Evidence</u>

Testimony was taken at the July 24, 2002, hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q       Do you smoke?

A       Yes.

Q       Do you drink?

A       No.

\*                    \*                  \*

Q       Okay.  Do you drive?

A       Occasionally.

Q       How many miles would you say in a typical week?

A       15.

\*                    \*                  \*

Q     How does your high blood sugar affect you?

A     When it's high?

Q     What does it make you feel like?

A     I get severe migraine headaches and really tired and exhausted.

Q     So severe migraines and fatigue are your two hallmark features - -

A     Yes.

Q     - - from that?  Do you have to lie down during the day?

A     Most of the day, lots of times.

Q     How long did you lie down yesterday?

A     About 5 hours.

Q     Can you, you said you, your left leg is affected by neuropathy.  And what does that mean to you?

A     Well, there's, it's very painful, it can go numb, it has tingling.  There's been times where I couldn't even stand on it.

Q     And it tingles.  Is there pain too?

A     Severe pain.  Like stabbing.

                         *                    *                    *

Q     How many pounds do you think you can lift?

A     Not very many, usually 10 or 15.

Q     Is the doctor talked to you about smoking?

A     Yes.  And I am working on that.  I started, I'm starting on the patches this evening for my, as a birthday present to myself.

<center>*         *         *</center>

Q      Do you also have back pain?

A      Only if I have my, only if I hold my youngest child.

Q      And how much does he or she weigh?

A      He weighs 30 pounds.

Q      Do you lift him very much?

A      No.  He sits on my knee more than I lift him.

<center>*         *         *</center>

Q      Okay.  Did she recommend or Dr. Mason recommend weight, exercise?  Because they said you weren't doing any exercise.

A      Yes, I was sent to physical therapy.  I have exercises that I do daily.

Q      All right.

A      Like stretches and - - -

<center>*         *         *</center>

Q      Okay.  How does depression affect you?

A      It makes me very, I'm very mean with my children sometimes.  And just don't want to be bothered by anybody half the time.  And I sleep a lot.

Q      How much do you sleep?  You said you sleep a lot?

A      I usually sleep half the day away.

<center>*         *         *</center>

Q      Are you able to take care of your children?

A      Actually, I take care of them a little bit, but my mother and my friends take care

<center>14</center>

of them more than I do.

Q	At least before you were sleeping too much Dr. Rush noted that you weren't sleeping much.

A	No, with the leg pain, until they got me on a pain medicine I couldn't sleep at all.

Q	Uh-huh.

A	Because it would be so discomfort, uncomfortable for me.

*	*	*

Q	What can you do during the day?   You said you lie down most of the day, yesterday 5 hours, and you sleep a lot.  What do you do while you're up?

A	Usually when I get up I try to, the first hour in the morning is getting my kids dressed and feeding them breakfast.  That's usually a chore within itself.  And by that time I'm ready to sit down and relax and just lay there.  And then I try to get up to feed them lunch.  And then I'll make their dinner sometimes, or their dad usually ends up doing it.

Q	At least at this time last year you went to an event called Jamboree in the Hills. Do you still do stuff like that?

A	No, I can't do that.

Q	Have you been on any vacations this summer?

A	No.

Q	Have you been out of town?

A	No.

*	*	*

Q	What about references to swimming?  Do you still do that?

15

A I haven't been swimming all summer.

Q Okay. All right. Thank you.

<p style="text-align:center">*   *   *</p>

EXAMINATION OF WITNESS BY ADMINISTRATIVE LAW JUDGE:

Q Ms. Duplaga, I've already sworn you in. And is there anything that your daughter has told me that you want to expand on or add that we haven't discussed?

A No, just, like she said, the tiredness, gets consistently tired. If I - -

Q How often do you see her?

A Everyday.

Q Okay.

A All, all, well, sometimes everyday.

Q Uh-huh.

A Usually, at least four times a week. I talk to her everyday.

Q And so you're confirming that she has fatigue and tiredness?

A Right.

Q What do you do for her at the house?

A I've cleaned, done laundry, take care of the boys, take the boys and just let her rest. You know, I've, I've cooked dinner, taken dinner down to her.

Q Okay.

A Just so she can, she doesn't have to do it. Because the exhaustion is just too much. So I make sure the boys are taken care of.

Q Uh-huh. Do you also help with the housework?

A       Yeah. Yeah, I've cleaned, like I said, and helped scrub her carpets and do laundry.

Q       Okay.  Anything else you want to add?

A       No, just, just seems like every time I turn around she's at the doctor.  You know, about the boys, it's just like trying to find a doctor who can do something.  But I guess they are doing all that they can do.  And I know you talked about her weight and we did her up, what, about 100 pounds about a month ago and it just, that sugar high, it just, they tell her that it just takes the fat cells.  And just in no time she was back down.

Q       All right.

A       So that's, just basically what she's told you, the fatigue and, like, right now her legs swells so bad we've got to get her to a doctor again because whatever that's from we don't know.

*                    *                    *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       Sir, you've already been sworn in.  Are your professional qualifications correct as contained in the record?

A       Yes, they are, Your Honor.

Q       Have we discussed this case?

A       No, we have not.

Q       Would you please describe Ms. Goode's past relevant work?

A       Okay, the work in telemarketing is sedentary exertionally and has a specific

vocational preparation of 3. The work at childcare at home is a medium exertional, it has an SVP of 3 also. The work, data entry with Aspen has a sedentary exertional, is at SVP 4. So we're talking about semi-skilled work, Your Honor. The work in the office, clerical work, would be, as a student aid workshop there, is light exertionally customarily and is semi-skilled, SVP 4. customer service is a light exertional and also is semi-skilled and SVP 4.

Q        Okay. Just because Ms. Everhart is out of the room, the hearing reporter, so I just want to make sure I get this. Telemarketer is sedentary, unskilled?

A        No, telemarketer is sedentary, low semi-skilled, SVP 3.

Q        Childcare is also low semi-skilled.

A        That's correct.

Q        SVP of 3, medium. Data entry is sedentary, semi-skilled -

A        And SVP -

Q        - - 4. Office with college is light, semi-skilled, 4. Customer service is light, semi-skilled, 4.

A        That's correct, Your Honor.

Q        Okay. Please assume a younger individual with an Associate college degree precluded from performing all but sedentary work with a sit/stand option; no hazards, such as moving dangerous machinery; unprotected heights; no climbing or walking on uneven terrain; work in a controlled environment; and, finally, unskilled, low-stress work. Low-stress defined as one and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry level. With those limitations can you describe any work this hypothetical individual can perform?

A        Okay, sedentary work, unskilled, SVP 2, as a laminator, Roman numeral I.  We have 75,000 nationally and in the region we have 900.  Sedentary work as a plastic design applier, unskilled with SVP 1, 60,000 nationally, 300 regional.  Sedentary work as a type copy examiner, unskilled and SVP 2, and you have  90,000 nationally, you have 850 regionally.

Q        Are those jobs consistent with the DOT?

A        Yes, they are, Your Honor.

Q        Second hypothetical, Ms. Goode testified that she lies down most of the day, yesterday 5 hours.  If even 2 of those hours, sir, were in the work, 8 to 4:30 format, one hour in the morning and one hour in the evening, if the claimant even had, if her testimony is credible and she lies down even two hours in an eight-hour day are those jobs impacted?

A        Yes, that would prevent her doing full-time work.

Q        Third hypo, the claimant has major depression.  If that affects her concentration to the extent can stay on task one-third to two-thirds of the day, are there any jobs, are those jobs impacted?

A        That would prevent her from doing that type of [INAUDIBLE], yes, Your Honor.

Q        All right.

Testimony was also taken at the June 11, 2003, hearing before the ALJ.  The following portions of testimony are relevant.

[EXAMINATION OF CLAIMANT BY ALJ]

Q        Okay.  Do you smoke?

A        No, I quit smoking.

Q        When did you quit?

A       Two weeks ago.

Q       Do you drink?

A       No.

Q       Do you have a driver's license?

A       Yes.

Q       How many miles do you drive in a typical week?

A       I haven't been driving at all.

Q       And why is that?

A       Because of my right knee.

                        *               *               *

Q       What was your most uncomfortable position?  What is or has been?  Sitting, standing, walking or all of them?

A       All of them.

Q       Okay.  Was anything, did you have to lie down during the day?

A       I lay down a lot during the day.

Q       Like in a typical day even before the surgery how much were you laying down?

A       You mean how many hours?

Q       Right.  Like say in a typical time period, 8:00 to 4:30, a workday, how many time did you have to lie down?  Is it just periodically or is it all day or was it - -

A       I usually lay - -

Q       - - twice a day?

A       - - I would lay down off and on all day.

Q        Okay.  And that was due to the pain?

A        Yes.

                        *                *                *

Q        Back to the diabetes, how does that affect you?  What does it - -

A        You mean my sugar levels?

Q        - - how does it make you feel?

A        Well if they get too high I spend a lot of time with ice packs on my head because they give me very severe migraines.  And if they're real low I get dizzy, nauseated, cold sweats.

                        *                *                *

Q        When you worked in the past, Ms. Goode, not the childcare job but the telemarketing you had diabetes then?

A        I had gestational diabetes while I was pregnant with my son.

Q        And that was in '99?

A        That started in '97.

Q        Okay.  But it didn't prevent you from working?  For example, I was trying to see what's changed about - -

A        Well yes, it - -

Q        - - if I gave you - -

A        - - it did affect - -

Q        - - a telemarketing job.

A        - - it affected me at work.  When I started taking insulin I'd have sugar lows and I'd have to, I spent more time in the break room eating, bringing my sugar level up than I did

working.  And I missed a lot of work going to the doctor.  And just - -

Q    What if I gave you that job back how would it, how would it be for you to have to work in that environment eight hours a day starting tomorrow?

A    I couldn't handle it no more.  There's no way.  I can barely handle the pressure of my children let alone working around people.

Q    What did you do yesterday?

A    Yesterday?  Laid around and watched TV.

Q    While your husband's at work you have, I assume the 5 year old's home?

A    Yes.

Q    Okay.  Do you have full care of him?

A    What do you mean?

Q    Of her?  Is the 5 year old - -

A    He stays home with me.

Q    Right.  Do you take care of him?

A    Not always.  My mother comes to help and my mother-in-law comes to help.

Q    The 10 year old, is that a boy or girl?

A    Boy.

Q    Does he, is he in any activities that you attend at school?

A    He's not in school activities outside.  He has wrestling and football and baseball.

Q    Do you take him I mean or and watch?

A    No, his dad does.

Q    Do you go to his - -

A       I went - -

Q       - - events?

A       - - I go to some.

                    *               *               *

Q       How far can you walk?

A       I don't walk far, I just walk around the house.

Q       Then, do you wear a brace on your right knee, where the surgery - -

A       Yes, I do, always.

Q       What about the left?

A       No.

Q       Do you all have, are you in a two-story house, one-story?

A       Two-story.

Q       Do you have trouble with the steps?

A       Yes, I do.  I sleep on the couch now.

Q       Are you still using ice on your knee?

A       Ice and heat both.

Q       Okay.

ALJ         Okay.  Ms. Duplaga, do you have any questions?

WTN         I was just going to, you know, go, I wanted to address the issue of the

knee.

ALJ         Sure.

WTN         Because the physical therapy's been going on for so long before they ever

decided, because with her insurance they had to try everything possible before she was allowed to go to a specialist.

ALJ          Okay.

WTN          So she's lived with this knee pain for over a year and then when she got when she couldn't barely walk at all they let her go. And like she said, they did the surgery. He's not real sure it took and they're going to have to decide something else on the right knee. And the left knee definitely has to be done. And the physical therapy will be continued for who knows when, you know. This has been going on over six weeks now, you know, just for that and still not being able to walk. And the fact is, what concerns us the most with the surgery is being a diabetic it takes two to three times longer to heal and that really concerns them when she goes in, you know, to surgery. So I just wanted that stated, you know - -

ALJ          Okay.

WTN          - - that , and as far as the walking I mean like steps, anything, that I'm down there to help, to do the cleaning and taking care of the kids and running errands for her.

(The witness, S. KAY DUPLAGA, having been first duly sworn in, testified as follows:)

Q          [INAUDIBLE] sister?

A          Yeah. Because it's just, you know, her walking, like she said she can't bend, still can't even bend down.

Q          You're her mother, right?

A          Right.

Q          Right. Do you see, what about these two children that Tricia had, was it after she worked as a telemarketer? Did you, there was four children at one time. Do you think she

worsened somewhat after the, they stopped coming in?

A     After they stopped coming in, well she had - -

Q     Because she stopped that in October 2000.

A     Right.  They had actually talked to her about quitting it because of the stress of watching them and then with her sugar levels, you know, dropping and going high it was really, to have children like that in the house, it wasn't really that safe.  Because if she went into a coma or had to have, you know, her emergency shot or anything it would have been really stress on her and, you know, that's, we had discussed, the psychologist - -

Q     Do you all live in the same household?

A     No.

Q     Okay.  Do you think Tricia's mental status is an important part of this claim or not?

A     Yeah, I do because I know memory wise it's, you know, the remembering things and just the depression itself with trying to remember all the medications she has to take and now going through all this surgery and just trying to function on a daily basis. You know, the stress mentally is just, as I said I'm there, try to be there a lot to try to have the kids, just to relieve some of it.  And we, we definitely  want to get her back with the psychologist but like you said we can't get her there while the knee surgery is going on.

Q     Has Tricia always been low weight?  Eighty-five is her normal weight?

A     Yeah.  They've always wanted her to try to put on maybe another 20 pounds but no matter what diet they try it just didn't work and they had told us too with the sugar highs, it eats up her fat cells, burns up the fat cells and it's almost impossible to put weight on.  Because

they try high fiber to put some on and then the carbohydrates of course, you know, one diet did one thing but it affected another thing so they have to keep trying different ways.

*            *            *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      Would you describe Ms. Goode's past work, please?

A      Yeah, I work with the cashier, bagger, data entry, [INAUDIBLE] and semi-skilled telemarketing, stock [INAUDIBLE] skills, data entry [INAUDIBLE] semi-skilled, telemarketer, sales rep, [INAUDIBLE] and semi-skilled and the childcare probably was skilled [INAUDIBLE].

Q      Okay.  Mr. Bell, please, with a high school education and additional college precluded from performing all but sedentary work, with a sit stand option, no hazards, such as machinery and heights, and no temperature extremes, no climbing, no uneven ground, work that is unskilled and low stress, defined as one and two step processes routine and repetitive tasks, primarily working with things rather than people, entry level.  With those limitations can you name any jobs a hypothetical individual can perform?

A      Yes, Your Honor, a hypothetical individual could function as a general office clerk sedentary, 299,000 national, [INAUDIBLE] regional [INAUDIBLE] machine tender, sedentary, 141,000 national, 1,400 regional.

Q      Okay.  The machine tendered doesn't involve moving machinery?

A      It doesn't involve hazardous machinery.

Q      Okay.

A      It's basically reloading, watching a machine do the job and then reloading - -

26

Q       Okay.

A       - - supplies [INAUDIBLE].

Q       Those jobs consistent with the DOT?

A       Yes.

                    *                    *                    *

Q       Mr. Bell, if the claimant's testimony was taken as credible regarding the need to
lie down periodically, periodically throughout the day, even if I downsize that to one hour in the
a.m. of the workday and one hour in the p.m. of the workday are those jobs effective?

A       That would eliminate a competitive work schedule, Your Honor.

Q       If the claimant's pain and complications affected her from, other impairments
affected her concentration as she alleged, where she could not stay on task one-third to two-
thirds of the work day, are those jobs impacted?

A       Yes, Your Honor.

Q       If the claimant had a job that she missed more than two days consistently a month
due to a bad day either relative to high blood sugar or low or other complications from her knee
or depression would that be a tolerable limit of absenteeism more than two days consistently?

A       [INAUDIBLE]

Q       Okay.

E.       Lifestyle Evidence

        The following evidence concerning the Claimant's lifestyle was obtained at the hearings
and through medical records.  The information is included in the report to demonstrate how the
Claimant's alleged impairments affect her daily life.

- Washes, bathes, dresses, and shaves herself (Tr. 110, 157)

- Prepares meals including food such as eggs, toast, sausage, sandwiches, soups, meat, potatoes, vegetables, and other side dishes (Tr. 111, 158)

- Does cleaning including doing laundry, dusting furniture, vacuuming, and washing dishes (Tr. 111, 158)

- Pays bills and manages bank accounts (Tr. 111, 158)

- Mends clothes and does child care (Tr. 111, 158)

- Shops for food, clothing, medicine, and cigarettes (Tr. 112, 160)

- Reads magazines for thirty minutes to one hour per day (Tr. 112, 160)

- Watches television for three hours per day (Tr. 112, 160)

- Listens to the radio for one hour per day and to records and tapes for one hour per day (Tr. 112, 160)

- Plays a musical instrument and collects dolls (Tr. 112)

- Enjoys gardening (Tr. 160)

- Smoked during some of the relevant time period (Tr. 215, 752)

- Could drive a car during some of the relevant time period.  (Tr. 728, 752)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Claimant contends the ALJ erred in failing to evaluate her condition under listing 5.08B(4) at step three of the disability determination process.  Claimant argues she meets this listing, thus entitling her to disability benefits.  Claimant also argues the ALJ's determination that other jobs

exist Claimant can perform lacks substantial evidence to support it.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Commissioner contends Claimant does not meet the requirements of listing 5.08B(4). Commissioner also argues substantial evidence supports the ALJ's determination that jobs exist for Claimant.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

      4.      Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

      5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

      6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied, not to substitute the court's judgment for that of the

Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

      7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence

inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot

determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231,

235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920,

and determine: 1) whether claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether

the claimant can perform her past work; and 5) whether the claimant is capable of performing

any work in the national economy.  Once claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment.  If the claimant does not

have listed impairments but cannot perform her past work, the burden shifts to the Secretary to

show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th

Cir. 1984).

C.      Discussion

I.

The ALJ's Evaluation of Claimant's Impairments Under Listing 5.08B(4)

Claimant first argues the ALJ erred by failing to evaluate her impairments under Listing

5.08 at step three of the disability determination process.  Claimant argues that the evidence

demonstrates her impairments meet the criteria of this listing, thus entitling her to presumptive

disability.  Commissioner disputes this argument.  Commissioner contends the evidence

demonstrates Claimant does not have impairments meeting this listing.

Medical listings are considered at the third step of the disability determination process. 20 C.F.R. § 416.920(a)(4)(iii). If Claimant meets a listing, she is considered disabled and entitled to benefits. Id. In Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit held the ALJ has a duty to identify the relevant medical listings and compare the evidence with the requirements of the listings. However, in McCartney v. Apfel, 28 Fed. Appx. 277, 279 (4th Cir. 2002), the court held a discussion of the evidence at step four of the disability process may substitute for a discussion at step three. The McCartney court was careful to point out that the evidence in the record made clear the ALJ had considered the listing. Id. Since the ALJ had viewed the claimant's "conditions through the prism" of the listing, the court rejected the argument the ALJ's decision was procedurally faulty. Id. at 280. The District of Maryland well summarized the significance of this law for when it is alleged, as here, that the ALJ failed to consider a relevant medical listing, in Schoofield v. Barnhart, 220 F. Supp. 2d 512, 522 (D. Md. 2002). The court stated:

> When the evidence in the administrative record clearly generates an issue as to a particular listing in the LOI [Listing of Impairments] and the ALJ fails to properly identify the LOI considered at Step Three, and to explain clearly the medical evidence of record supporting the conclusion reached at that critical stage of the analysis, a remand can be expected to result, except in those circumstances where it is clear from the record which listing or listings in the LOI were considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion.

Id.

In relevant part, listing 5.08 states as follows:

5.08 *Weight loss due to any persisting gastrointestinal disorder*: (The following

32

weights are to be demonstrated to have persisted for at least three months despite prescribed therapy and expected to persist for at least twelve months.)  With:

. . .

B.  Weight loss equal to or less than the values specified in Table III or IV and one of the following abnormal findings on repeated examinations:

. . .

4.  Uncontrolled diabetes mellitus due to pancreatic dysfunction with repeated hyperglycemia, hypoglycemia, or ketosis[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08B(4).  Claimant must meet all the criteria of the listing to qualify for benefits.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  A person who meets only some criteria does not qualify, irregardless of how severe the other impairments are.  Id.

The ALJ here did not identify listing 5.08 or discuss whether Claimant's impairments satisfied the criteria of listing 5.08B(4) in either of his two opinions.[7]  (Tr. 20-29, 388-99).  Therefore, under Schoofield, the court must ask a series of questions.  First, does the record generate an issue as to a listing?  Schoofield, 220 F. Supp. 2d at 522.  If not, the inquiry obviously ends there.  Cook, 783 F.2d at 1173 (providing that only relevant listings need to be identified).  If there is an issue, does the record make clear the listing was considered?  Schoofield, 220 F. Supp. 2d at 522.  If the record does not show this, the Court must remand for consideration.  Id.  If the listing was considered, did the ALJ discuss the evidence at another point in his opinion to allow the Court to find substantial evidence supports the step three analysis?  Id.

The first issue in evaluating a claim under listing 5.08B(4) is whether the record contains

---

[7] The ALJ's second opinion incorporated the discussion of the evidence from the first opinion by reference.  (Tr. 21).  Thus, the first opinion should be considered.

evidence that Claimant weighed "equal to or less than the values specified in Table III or IV" for a period of at least three months where the weight could be expected to remain at that level for twelve months. 20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08B(4). Table III concerns men and Table IV concerns women. 20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08. Table IV provides a list of heights in inches and a corresponding list of weights a person may have under the listing. Id. Naturally, the taller a person is, the more the person is allowed to weigh. Id.

A problem arises in this case because Claimant's height is unclear. Claimant has been measured as between 60 1/2 inches and 62 inches. (Tr. 215, 221, 258, 288, 365, 376). The ALJ did not make a finding regarding Claimant's height in either of his opinions. Since the issue here is only whether the record creates an issue regarding the listing, the Court gives Claimant the benefit of the doubt and assumes (without finding) that her height is 62 inches. A woman with a height of 62 inches may weigh 92 pounds or less under the listing. 20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08.

The record clearly demonstrates there is an issue regarding Claimant's weight for at least some of the relevant time period. In August 1998, Claimant weighed 86 pounds. (Tr. 522). She was down to 77 pounds in March 1999, which continued into April. (Tr. 520-21). Another reading in April 1999 showed Claimant to weigh 84 pounds. (Tr. 518). In August 1999, Claimant was measured at 85 pounds and 89 pounds. (Tr. 257-58). Claimant was measured at 88 pounds and 91.5 pounds in October 1999. (Tr. 255-56). Claimant weighed 85 pounds in December 1999. (Tr. 254). Claimant was still under the listing weight in April 2000, weighing 90 pounds. (Tr. 253). She dropped down to 85 pounds in by July and August of 2000. (Tr. 251-52). She gained a pound by September 2000, but was down to 84 pounds by October. (Tr. 249-

250).  Claimant weighed 89 pounds in November 2000 and 87 pounds in December 2000.  (Tr. 247-48).  Claimant was down to 84.5 pounds in May 2001.  (Tr. 246).  The record shows Claimant weighed more than the listing weight in July 2001 at 94 pounds.  (Tr. 215).  However, the record clearly shows that Claimant met the listing weight for most of the first two years after the filing of her application.  There is clearly an issue as to weight under the listing.

The next issue to consider is whether the record generates an issue as to uncontrolled diabetes mellitus.  20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08B(4).  Claimant complained of elevated blood sugar in August 1999.  (Tr. 257-58).  Dr. Wayt prescribed treatment to help her blood sugar level.  (Tr. 259).  The treatment was successful, for by October 1999 Claimant's blood sugar was relatively under control.  (Tr. 255).  Dr. Wayt scheduled a follow up visit for two months from that time.  (Id.).  Claimant's blood sugar was only sixty five in December 1999.  (Tr. 254).  Claimant again reported controlled blood sugar levels in July 2000.  (Tr. 252).  Claimant's blood sugars were again well controlled in September 2000.  (Tr. 250).  Yet by October 2000, Claimant reported very erratic sugar levels.  (Tr. 249).  Wide variations were again noted that November and December.   (Tr. 247-48).  Claimant's diabetes was again uncontrolled in May 2001.  (Tr. 246).

Although Claimant had uncontrolled diabetes to go along with her low weight, as required by the listing, Claimant's uncontrolled diabetes does not overlap with her low weight for one year and therefore there is no issue of listing 5.08B(4) in the record.  The listing requires low weight to be expected to remain for one year.  20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08.  As noted above, Claimant has clearly demonstrated this.  Yet Claimant must also demonstrate uncontrolled diabetes to go with the low weight.  Id.  While Claimant was diagnosed with

uncontrolled diabetes in October 2000, this was less than one year from when her weight exceeded the listing level. 20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08; (Tr. 249, 215). Therefore, Claimant has not demonstrated low weight for the required time period "With" uncontrolled diabetes. Id. Claimant must show all the requirements of the listing to qualify for benefits. Zebley, 493 U.S. at 530.

Since the record shows no issue as to listing 5.08B(4), the ALJ was not required to consider. Cook, 783 F.2d at 1173. Claimant's arguments in this respect should be rejected.

II.

The ALJ's Determination Jobs Exist Claimant Can Perform

Claimant next argues the ALJ erred in finding she could perform other work. Claimant states that although the Vocational Expert (VE) testified certain other positions exist and stated those positions exist in substantial numbers, that testimony was inconsistent with the Dictionary of Occupational Titles (DOT). Commissioner contends the ALJ correctly identified work Claimant can perform.

When a claimant shows an inability to resume prior work, the burden falls to Commissioner to demonstrate "that the claimant, considering his age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternate job and that this type of job exists in the national economy." Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir. 1987). The Regulations provide the ALJ may consider VE testimony and the DOT in determining whether work exists suited to a claimant's residual functional capacity. 20 C.F.R. § 404.1566. Social Security Ruling (SSR) 00-4p states VE testimony and the DOT should normally be consistent. The ALJ has an affirmative duty to ask the VE about any conflicts

between his testimony and the DOT.  Id.  Where a conflict exists, neither source automatically prevails.  Id.  The ALJ should resolve a conflict by deciding whether the VE testimony is reasonable and provides grounds for relying on the testimony over the DOT.

In this case, the ALJ asked the VE whether there were any jobs available to a hypothetical person having the residual functional capacity ultimately assigned to Claimant in the ALJ's decision.  (Tr. 28, 769).  The VE responded such a person could perform the jobs of general office clerk and machine tender.  (Tr. 769).  He further stated these positions were consistent with the DOT.  The ALJ relied upon this testimony in finding Claimant not disabled. (Tr. 27, 29).

The VE's testimony was not consistent with the DOT.  The position of general office clerk is described in DOT listing 219.362-010.  The job requires a light level of exertion.  The Court is aware of no DOT listing for this position requiting only sedentary exertion.  Yet the ALJ restricted Claimant to only sedentary work in his opinion and his hypothetical.  (Tr. 28, 769). Since the restriction to sedentary exertion is inconsistent with the general office clerk position, the ALJ was required to obtain testimony from the VE to explain the discrepancy.  SSR 00-4p. The ALJ understandably did not obtain this testimony since the VE stated his testimony was consistent with the DOT.  However, this means the ALJ's reliance on the position of general office clerk is not supported by substantial evidence.  Commissioner appears to concede this point since under his argument regarding this issue he does not mention the general office clerk position.

The VE's testimony regarding the machine tender position was also not consistent with the DOT.  The DOT does not list any position known as "machine tender."  Rather, many

different positions are listed as types of machine tenders. These positions are scattered throughout the DOT. A computer search of the DOT index revealed 230 instances where a machine tender position is listed. The Court cannot guess at which positions the VE had in mind when he offered the machine tender position as a job Claimant could perform. Cf. Bill Branch Coal Corp. v. Sparks, 213 F.3d 186, 191 (4th Cir. 2000). The ALJ's reliance on the machine tender position is not supported by substantial evidence.

Therefore, this case should be remanded to the ALJ. The ALJ should give further consideration to the question of whether Claimant can perform any positions consistent with her residual functional capacity.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner so he may give further consideration to the question of whether Claimant can perform any positions consistent with her residual functional capacity.

2.       Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment

of this Court based upon such Report and Recommendation.


DATED: June 26, 2007

<div style="margin-left: 40%;">

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE

</div>